IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 21, 2021

**WILLIAM COLE NICHOLSON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County
No. 63CC1-2014-CR-801  William R. Goodman, III, Judge**
————————————————————

**No. M2020-01128-CCA-R3-PC**
————————————————————

William Cole Nicholson, Petitioner, was convicted of one count of aggravated sexual battery, and this court affirmed his conviction on direct appeal. *State v. William Cole Nicholson*, No. M2017-01761-CCA-R3-CD, 2018 WL 4203549, at *1 (Tenn. Crim. App. Sept. 4, 2018), *no perm. app. filed*. Petitioner filed a pro se post-conviction petition and an amended petition through counsel, arguing that he was denied the effective assistance of counsel. The post-conviction court denied the petition, and Petitioner now appeals. Following a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which J. ROSS DYER, J., joined. NORMA MCGEE OGLE, J., concurred in results only.

Daniel P. Ufford, Clarksville, Tennessee, for the appellant, William Cole Nicholson.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

*Direct Appeal*

We summarize the facts from the direct appeal as follows:

S.N., Petitioner's wife and mother of the victim,[1] had five children when she married Petitioner in 2008. In 2010, she and her family moved with Petitioner to Clarksville when he was stationed at Fort Campbell. In 2012, S.N. told Petitioner she wanted a divorce, but she and Petitioner continued to co-parent the children. In 2013, Petitioner moved into an apartment that he shared with a roommate. Petitioner had the master bedroom in the apartment with a bathroom adjacent to his room. *Id*. at *1.

L.M. was twelve years old when Petitioner moved to the apartment, and she and her siblings would spend the night there "[e]very weekend, if not every other weekend." In the apartment, Petitioner had a twin bed and a futon for the children to use when staying the night. L.M. had a "[d]ad and daughter" relationship with Petitioner, and they were "very close." *Id*.

S.N. learned of an incident between Petitioner and L.M. through a written note, and initially, L.M. denied the incident with Petitioner. Soon thereafter, L.M. received mental health treatment at a facility. Although no official diagnosis was made, medical professionals observed L.M. and found that L.M. was "hearing voices since the incident happened" and said that her behaviors indicated "borderline schizophreni[a], multiple personality and depression." S.N. said that L.M.'s behaviors did not arise until after the offense. *Id*.

L.M. testified that, one evening when she was twelve years old and visiting Petitioner's apartment, she took a shower in the bathroom adjacent to Petitioner's bedroom. Although she usually dressed in the bathroom after a shower, this time she forgot a shirt, so she came out of the bathroom wearing her underwear and wrapped in a towel to look for her clothes in her bag next to the futon in the bedroom. *Id*.

While holding the towel around her, L.M. bent over to look in her bag. L.M. testified that she knew at that time that Petitioner was behind her so she "shuffled to the side a little bit" because she thought she was in Petitioner's way. L.M. testified that Petitioner, while standing behind her, "placed his hands around [her] hips and . . . put his thighs against [hers] and [she] could feel the outline of his privates" on her buttocks. She said that Petitioner's "privates" felt hard. L.M. said, "what are you doing, you little weirdo," and Petitioner replied, "don't give me attitude." Petitioner then went to take a shower. *Id*.

L.M. did not tell S.N. about the offense right away because she was scared. Instead, L.M. wrote a note to her best friend to tell her about the offense because "[i]t was becoming

---

[1] To protect the anonymity of the minor victim, we refer to both the victim and her mother by their initials.

a really big burden on my heart." S.N. received the note, but when she confronted L.M., L.M. denied it because she "was scared and . . . didn't want to . . . break up the family." L.M. later realized that she "had to make sure everybody knew" what had happened before she was sent to the mental health facility. L.M. said that she told the doctors at the mental health facility that she had been hearing voices since "[a] little while after the incident" whenever she got "extremely upset." *Id.* at *2.

Clarksville Police Department Detective DeMone Chestnut interviewed Petitioner about the offense, and Petitioner initially denied all allegations but later "admitted to putting [L.M.] in a bad situation." Petitioner also "admitted to grabbing [L.M.] and pressing his penis up against her buttocks . . . [and] admitted that he did have an erection," but Petitioner denied that it was for sexual gratification. Petitioner told Detective Chestnut that L.M. did not lie and that "[e]verything she said was true." During the interview, Petitioner wrote a letter of apology to L.M. The relevant portion of the letter is as follows:

> I also want you to know that I am actually proud of you for doing what you believed was right, and I hope you continue doing so. I hope that you can forgive me one day and that you, your sisters, and brother, and I can hopefully start building a relationship again.

*Id.*

When asked whether Petitioner specifically admitted to "grabb[ing] hold of [L.M.] and rubb[ing] his private area on her buttocks," Detective Chestnut responded, "He admitted what [L.M.] stated was truthful." Detective Chestnut then testified that Petitioner admitted that "he may have bumped into [L.M.]" but that Petitioner never admitted to having an erection during the incident. In the video of the interview, the following exchange occurred:

> Detective Chestnut: You're saying that your penis did touch her, that you did have an erection, but it wasn't done purposely and you wasn't, you're not sexually aroused by her?
>
> Petitioner: Correct.

*Id.* at *2-3.

Detective Chestnut testified that he understood Petitioner's answer of "[c]orrect" as a response to all three questions.

- 3 -

Petitioner testified that, during the offense in question, L.M. came out of the bathroom wrapped in a towel to get her clothes and that he "went to get out of her way" because he "was uncomfortable with her state of dress." He said that "there was a small space" and that he "bumped into her." Petitioner stated that L.M. was bent over when he moved behind her and acknowledged that it was possible that he had an erection at that time. Petitioner did not recall putting his hands on L.M. when he moved past her but stated that "[a]nything is possible." He said that he did not intend to touch L.M. in a sexual manner. *Id*. at *3.

Petitioner stated that he never admitted to Detective Chestnut that he had an erection. He said that he initially denied the allegations because he "had no reason to think of this particular situation" when L.M. said that he had touched her. Petitioner explained that, when Detective Chestnut asked him the series of three questions during the interview, Petitioner's response of "[c]orrect" was intended only as a response to the last question of "you're not sexually aroused by [L.M.]?" and that his answer was not intended as an admission to all three questions. He said that he wrote the letter to L.M. "to try to bring reconciliation to the family" and did not intend it as an admission of sexual assault. *Id*.

Petitioner also testified that, after L.M. went to the mental health facility, he learned that she "hears things" and "had been hallucinating." He stated that, prior to the offense, L.M. would "pull her hair" and "get very – almost over the top upset" over "[w]hatever pushed her buttons at that time." Petitioner testified that he and S.N. had discussed mental health treatment for L.M. prior to the offense, but S.N. "didn't follow through on it." *Id*.

A jury found Petitioner guilty of aggravated sexual battery and sentenced him to eight years' incarceration, and this court affirmed his conviction on direct appeal. *Id*. at *3-*4.

*Post-Conviction Petition and Hearing*

Petitioner filed a timely pro se Petition for Post-Conviction Relief and an amended petition through counsel (collectively "the Petition") arguing that he was denied the effective assistance of counsel. He claimed that trial counsel (1) failed to introduce L.M.'s mental health records at trial; (2) failed to subpoena L.M.'s mental health physician; (3) failed to interview favorable witnesses or subpoena them; (4) failed to be available for communication during trial because he sat at the prosecution table, leaving Petitioner to sit alone at the defense table; (5) failed to object to Detective Chestnut's presence during the testimonies of witnesses prior to Detective Chestnut's testifying; and (6) failed to file a motion to suppress the video of the police interview.

- 4 -

At the hearing on the Petition, trial counsel testified that he did not recall how many times he met with Petitioner. He did not recall discussing L.M.'s mental health records with Petitioner. Trial counsel said that he received documents "related to the child" that he did not believe he was supposed to have. He explained, "I felt very uncomfortable even having them in my possession [be]cause I wasn't sure that we were supposed to have them. . . . I didn't get them from the D.A., as far as I can recall. I believe they came from [Petitioner]." Trial counsel recalled that, after Petitioner was charged, Petitioner procured L.M.'s medical records without speaking to her mother, so trial counsel was concerned about possible HIPPA violations. Trial counsel testified that he "didn't do anything" about the records and did not file an "appropriate subpoena" for them.

Trial counsel "could only assume" that he discussed favorable witnesses with Petitioner but said that Petitioner was the only witness at trial for the defense.

Regarding whether trial counsel sat with Petitioner during trial, he stated:

[T]he only time I don't sit with my clients at a jury trial is either when I'm at the podium questioning people or if I have to move to be able to see a witness better or to watch the screen. Because in this courtroom if you have a short witness and I'm sitting right there, I can't see them through the podium. [S]o I know I have sat behind [the prosecutor] on the bench back there before[,] and if I go to her table, it's during a break where we're conferring something.

Trial counsel explained that any judge "would want to know why I'm not sitting next to my client during the course of the trial and sitting at the prosecutor's table the whole time. I just can't believe that I did that."

Trial counsel stated that he does not allow his clients to talk to him while anyone is testifying so that he will not miss an important piece of testimony. He explained that he gives his clients paper and "their own pen" to write down questions and comments and that he reviews a client's comments before and after his cross-examination of a witness. Trial counsel did not recall whether Petitioner had any questions or comments during trial.

Trial counsel testified that Petitioner wrote a letter to L.M. at the request of police. He explained that Petitioner "wasn't in custody when he wrote it, and he wasn't forced to do it. He didn't have to so there was no -- no *Miranda* issue or anything like that."

Trial counsel said that, in many sexual abuse cases with videos, he would "hire" a "juror" pretrial to get an "honest opinion" about the effect of the videos and "how bad or how good it looks or whatever else." He did not recall whether he hired a mock juror to review Petitioner's police interview video. Trial counsel said that there were no concerns

about the constitutionality of the video because Petitioner went to the police station voluntarily. Trial counsel explained that the police "sucker people into hanging themselves" by telling them that they can leave at any time during the interview, therefore not requiring the reading of *Miranda* rights.

Trial counsel stated that he always discusses a client's testimony with the client prior to trial and discusses whether testifying is in the client's best interests. He said that he tries to teach his clients how to testify like Tennessee Bureau of Investigation experts who testify like "professionally-trained actors" who "turn to the jury and look at them." He stated, "I leave it up to [the clients] to make the decision, [and] I can't say that I told [Petitioner] to testify but I probably did."

Trial counsel did not recall if he filed any pretrial motions or if there was a forensic interview of L.M. He did not recall whether Petitioner discussed L.M.'s sexual history with him.

On cross-examination, trial counsel stated that he had been practicing law since 1997 and that he had been counsel for about thirty trials. He said that he did not recall Detective Chestnut sitting at the prosecution table during trial. Trial counsel said that it was "pretty standard" to have the investigating officer sitting at the prosecution table during trial as the State's representative. He agreed that he cross-examined L.M. and S.N. about L.M.'s mental health history at trial and that L.M. and S.N. admitted to L.M.'s mental health issues.

Trial counsel recalled that he and the prosecutor together opened the letter Petitioner wrote during his police interview and that the letter had been sealed for "a long time." Trial counsel said that he did not recall that the letter was an admission of guilt but that it was an apology because police "asked him to write one." He agreed that, when the prosecutor questioned Petitioner at trial, Petitioner said it was "possible" that he had touched L.M. with his "privates" and that he had an erection. Trial counsel explained,

> If you're being accused of sexually assaulting a child in that way, you definitely do not say you might have had an erection when you went up and did that to the child. . . . That just destroys your whole defense that what you did . . . wasn't for a sexual purpose or sexual gratification.

> And when he said that, I think my jaw probably dropped, as in, what in the world were you thinking saying that? He didn't admitted [sic] that he did it for a sexual purpose but when you asked him that and he said he may have an erection when he did that, sorry, that was -- that did him in.

Trial counsel agreed that L.M. and Petitioner were the only people present at the time of the offense, and thus, they were the only witnesses.

Petitioner testified that he retained trial counsel after his police interview and that he met at trial counsel's office "four or five times." He said that, after he was charged with the present offense, he moved to South Carolina in 2014, after he separated from the Army. Petitioner said that trial counsel would not return his phone calls for up to two weeks.

Petitioner said that trial counsel did not give him a reason why he did not want to introduce the medical records at trial. He stated that trial counsel did not hire an investigator and that trial counsel did not discuss with him the contents of L.M.'s forensic interview. Petitioner said that he was concerned about the interview because he claimed L.M's story had "multiple variations." Petitioner did not believe that trial counsel appropriately addressed the inconsistencies in L.M.'s story. Petitioner stated that trial counsel did not hire a "mock juror" in his case.

Petitioner said that trial counsel left his belongings at the defense table but that, "any time the jury was [t]here," he sat on the prosecution side, and Petitioner sat by himself. Petitioner recalled that the only time trial counsel sat with him was during jury instructions. Petitioner agreed that trial counsel provided him a pen and paper to write down comments and questions but said that trial counsel did not look at or consider his comments and questions.

Petitioner stated that he understood that Detective Chestnut was the State's representative at trial but that he was concerned that Detective Chestnut could have altered his testimony based on prior witnesses' testimonies. He recalled that, when he discussed this concern with trial counsel, trial counsel said that it was "agreed upon and that the court was okay with it."

Petitioner said that he "had no qualms" about testifying and that he agreed to do it. However, he said that trial counsel never went through his testimony with him prior to trial. Petitioner did not believe that trial counsel effectively explained the ramifications of testifying at trial.

On cross-examination, Petitioner agreed that he never told trial counsel that he had an erection that he pressed against L.M. He agreed that trial counsel was "rightly surprised" by Petitioner's testimony at trial. Petitioner stated that, when police interviewed him, he was free to leave and that he left when the interview was over. He said that he voluntarily wrote the apology letter to L.M.

Petitioner said that, when he learned that L.M. was going to testify at trial, he was not sure what she was going to say. He explained that there were "a couple versions to her story" and that he was unaware what her testimony at trial would be. Petitioner agreed that trial counsel cross-examined L.M. and S.N. about L.M.'s mental health issues.

Petitioner agreed that, even though trial counsel sometimes took up to two weeks to return his phone calls prior to trial, trial counsel always called him back.

*Post-Conviction Court's Order Denying Petition*

The post-conviction court denied the Petition in a written order. Regarding L.M.'s mental health records, the post-conviction court noted that Petitioner did not produce those records for the post-conviction hearing and that he did not provide any evidence as to what L.M.'s mental health physician would have testified to at trial. Thus, the court concluded that Petitioner did not establish prejudice for trial counsel's failure to submit the records or subpoena the physician.

Likewise, the post-conviction court noted that Petitioner failed to establish which "favorable witnesses" trial counsel did not subpoena for trial or what those witnesses would have testified to at trial. The court stated that Petitioner did not establish either deficiency or prejudice for trial counsel's failure to call favorable witnesses.

The post-conviction court concluded that Petitioner's allegation that trial counsel sat at the prosecution table was "not proven" and was "without merit." The post-conviction court stated that it did not "have any recollection of such actions on the part of trial counsel" during trial.

The post-conviction court noted that Petitioner failed to produce any authority for his contention that trial counsel should have moved the court to have Detective Chestnut testify first so as not to "taint" his testimony with other witnesses. The post-conviction court explained,

> The State has the prerogative to designate its representative, and the right to call its witnesses in such order as it may choose. The failure of trial counsel to object to this procedure is not found to be below the standard described in *Goad v. State*, 938 S.W.2d 363 (Tenn. 1996), and therefore this issue is found to be without merit.

Regarding the video of Petitioner's police interview, the post-conviction court concluded that Petitioner presented no evidence that the video was unreliable. It found that

- 8 -

Petitioner's interview was voluntary and that Petitioner failed to establish any basis for its suppression at trial.

Petitioner now timely appeals.

## Analysis

*Post-Conviction Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad*, 938 S.W.2d at 370. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct

from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

<u>1. Failure to Move the Trial Court to Require Detective Chestnut to Testify First</u>

Citing *State v. Stephens*, 264 S.W.3d 719, 738 (Tenn. Crim. App. 2008), Petitioner argues that "[i]t is clearly established law that the State's designated witness must be the first witness to testify." He contends that Detective Chestnut's "ability to then clean up any holes in [prior] testimony" by testifying after other witnesses undermined the confidence in the trial's outcome.

The State responds that *Stephens* "is no longer good law" and that "the law of sequestration of witnesses is now governed by the rules of evidence." It argues that our supreme court, in *State v. Jordan*, 325 S.W.3d 1 (Tenn. 2010), held that Tennessee Rule of Evidence 615 permitted the State to designate "an investigating officer as immune from sequestration" and gave the trial court discretion "to decide if and when a witness immune from sequestration should be sequestered[.]" *State v. Randall T. Beaty*, No. M2014-00130-CCA-R3-CD, 2016 WL 6600148, at *19 (Tenn. Crim. App. Nov. 8, 2016) (opinion on remand), *perm. app. denied* (Tenn. Mar. 9, 2017). The State contends that Petitioner has not shown deficiency or prejudice for trial counsel's failure to move the trial court to sequester Detective Chestnut.

Tennessee Rule of Evidence 615 states the following, in pertinent part:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.

Tenn. R. Evid. 615. The purpose of this rule is "to prevent one witness from hearing the testimony of any other witness and adjusting his testimony[.]" *Smith v. State*, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977). "[I]f the State is a party, the prosecuting attorney may designate a crime victim, a crime victim's relative, or an investigating officer as immune from sequestration." *Jordan*, 325 S.W.3d at 40.

"We acknowledge that panels of this court have said that the proper practice is for the State to call its designated representative as its first witness." *State v. Johnny James Parrish*, No. E2019-00664-CCA-R3-CD, 2020 WL 2510530, at *14 (Tenn. Crim. App. May 15, 2020) (citing *State v. James Michael Naive*, No. M2012-00893-CCA-R3-CD, 2013 WL 4505395, at *19 (Tenn. Crim. App. Aug. 21, 2013), *perm. app. denied* (Tenn. Dec. 11, 2013); *State v. Timothy Wright*, No. W2005-00525-CCA-R3-CD, 2005 WL 3533343, at *3 (Tenn. Crim. App. Dec. 27, 2005), *abrogated by Randall T. Beaty*, 2016 WL 6600148 at *15-20), *perm. app. denied* (Tenn. Oct. 8, 2020). However, this court subsequently "clarified the case law surrounding the issue of sequestration of prosecuting witnesses and held, based on *Jordan*, that 'Rule 615, as amended in 1997, supplanted the condition'" that the State's representative "'should be required to testify first or to be sequestered.'" *State v. David Roger Petty*, No. M2016-01036-CCA-R3-CD, 2017 WL 4457592, at *9 (Tenn. Crim. App. Oct. 5, 2017) (quoting *Randall T. Beaty*, 2016 WL 3752968, at *20).

Here, trial counsel testified that it was "pretty standard" to have an officer sitting at the prosecution table during trial as the State's representative. The post-conviction court stated that "failure of trial counsel to object to this procedure is not found to be below the standard described in *Goad* [], and therefore this issue is found to be without merit." Likewise, because there is no established law that the State's representative testify first, we conclude that trial counsel's failure to request that Detective Chestnut testify first or be sequestered did not "fall below an objective standard of reasonableness." Moreover, Petitioner has not established in what way Detective Chestnut's testimony was allegedly tainted, and thus, he cannot prove prejudice. *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Ziberia Marico Carero v. State*, No. E2019-01123-CCA-R3-PC, 2020 WL 1873474, at *4, *9 (Tenn. Crim. App. Apr. 14, 2020) (finding no deficiency or prejudice when trial counsel requested the sequestration rule but the investigating officer

remained in the courtroom as the State's representative and testified subsequent to the confidential informant), *perm. app. denied* (Tenn. Jan. 13, 2021).

### 2. Failure to Investigate and Introduce L.M.'s Medical Records

Petitioner argues that trial counsel knew of L.M.'s mental health records but failed to investigate those records and introduce them at trial. He argues that trial counsel did not seek to obtain the records by legal means and that "trial counsel chose not to pursue that investigation because trial counsel simply did not know what to do."

The State responds that Petitioner failed to produce L.M.'s medical records for the post-conviction hearing and thus did not make the necessary factual showing to establish deficiency or prejudice for failure to introduce the records at trial. Further, the State argues that Petitioner did not raise trial counsel's "failure to investigate" as an issue in the post-conviction court, thus waiving the issue. In any event, the State contends that "it is unclear how trial counsel could be faulted for 'failing to investigate' medical records that he already possessed." We agree with the State.

"To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). The post-conviction court cannot speculate as to what the testimony of the missing witness may have been at trial and therefore cannot determine if the testimony would have amounted to critical evidence. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Without the post-conviction hearing testimony of a missing trial witness, it is nearly impossible for a petitioner to show that trial counsel's deficient performance in failing to discover or call a trial witness prejudiced the defense. *See Strickland*, 466 U.S. at 687. "The same is true for documents that a petitioner claims should have been presented at trial." *Daetrus Pilate v. State*, No. W2017-02060-CCA-R3-PC, 2018 WL 3868484, at *5 (Tenn. Crim. App. Aug. 14, 2018), *perm. app. denied* (Tenn. Dec. 6, 2018). "Failure to present the documents at the post-conviction hearing makes it nearly impossible for [a] [p]etitioner to show that trial counsel's deficient performance in failing to obtain or introduce the document at trial prejudiced the defense." *Id.* Because Petitioner did not introduce L.M.'s medical records at the post-conviction hearing, Petitioner has not established deficiency or prejudice, and he is not entitled to relief on this issue.

### 3. Failure to Seek Admission of L.M.'s Forensic Interview

Petitioner argues that trial counsel was deficient for failure to introduce the video of L.M.'s forensic interview. The State responds that this issue was not raised at the post-conviction hearing, and thus, the issue is waived.

At the post-conviction hearing, the following exchange occurred:

[POST-CONVICTION COUNSEL]: Do you recall whether there was a forensic interview of the victim?

. . . .

[TRIAL COUNSEL]: I don't know. I – it's pretty standard. I don't even think they would have brought a case -- this particular case, I don't think they would have brought without that interview.

Then, during Petitioner's testimony, the following exchange occurred:

[POST-CONVICTION COUNSEL]: Did -- during the investigation of this incident, was [L.M.] interviewed by the police or any representative of the law enforcement?

[PETITIONER]: Yes.

. . . .

[POST-CONVICTION COUNSEL]: Okay. Did you have a chance to discuss that with [trial counsel]?

[PETITIONER]: No, we didn't talk that much.

[POST-CONVICTION COUNSEL]: The contents of that interview. . .

[PETITIONER]: No.

[POST-CONVICTION COUNSEL]: . . . whether or not there was a transcript of that interview?

[PETITIONER]: No.

[POST-CONVICTION COUNSEL]: Okay. None of that was ever brought up to you by [trial counsel]?

[PETITIONER]: No, sir.

[POST-CONVICTION COUNSEL]: How were you made aware that there was an interview of [L.M.] during the investigation?

[PETITIONER]: When he informed me that she would be testifying because her forensic interview was not going to be allowed.

[POST-CONVICTION COUNSEL]: And that was before trial?

[PETITIONER]: That was before trial.

[POST-CONVICTION COUNSEL]: How long before trial?

[PETITIONER]: (Respite.) It was one of the (respite) I don't remember if it was the morning before trial began or one of the times -- one of the last times we met before trial began, but it was not -- it was soon after I was made aware that trial began.

[POST-CONVICTION COUNSEL]: Okay.

[PETITIONER]: I can't remember exactly when.

[POST-CONVICTION COUNSEL]: Did you have any concerns about that interview?

[PETITIONER]: I -- I've had concerns, I would say, from the start because the story had been there has been multiple variations to the story. The night that the whole allegation came up, she changed -- you know, she said it didn't happen but, yet, then later she said it did happen. So I . . .

[POST-CONVICTION COUNSEL]: Do you feel that [trial counsel] properly addressed that inconsistency?

[PETITIONER]: I do not.

During closing argument, post-conviction counsel did not argue that trial counsel was ineffective for failing to introduce L.M.'s forensic interview, and the post-conviction court did not address it in its written order denying relief. Moreover, Petitioner did not introduce L.M.'s forensic interview at the post-conviction hearing to establish any alleged inconsistencies.

- 14 -

It is a well-established rule that this court will not address post-conviction issues that were not raised in the petition or addressed by the post-conviction court. *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996); *State v. Smith*, 814 S.W.2d 45, 49 (Tenn. 1991); *see also Michael F. Maraschiello v. State*, No. M2019-01287-CCA-R3-PC, 2020 WL 7090200, at *13 (Tenn. Crim. App. Dec. 4, 2020), *perm. app. denied* (Tenn. Apr. 7, 2021) ("Any issues not raised in the petition and not raised in the post-conviction court are considered abandoned."). Because Petitioner did not include this issue in the Petition and did not argue this issue as a basis for the ineffective assistance of counsel at the post-conviction hearing, we conclude the issue is waived.

### 4. Failure to Communicate with Petitioner

Petitioner argues that the testimony at the post-conviction hearing established that trial counsel "made little effort to communicate with [Petitioner]" and that he did not read the notes Petitioner made during trial. He contends that this failure to communicate "led to a further lack of investigatory material" and a "a lack of favorable evidence being presented" at trial. Petitioner states that "both trial counsel and [Petitioner] testified that trial counsel sat at or behind the prosecution table *at least* all the time that witnesses were on the stand being interviewed[,]" which constituted the "majority" of trial. He asserts that trial counsel's behavior "deteriorate[d] the jury's perception" of Petitioner and biased the jury against him.

The State responds that the post-conviction court accredited trial counsel's testimony that he would "never abandon a client in a manner described by [P]etitioner" and that the court's recollection of trial mirrored trial counsel's testimony. It contends that "[t]his [c]ourt is not well-positioned to second-guess the post-conviction court's credibility determinations or its personal recollection of trial events." The State also argues that, because Petitioner failed to produce the notes he wrote at trial and did not testify as to the contents of those notes, the post-conviction court could not speculate as to what might have been in the notes and whether trial counsel's alleged inattention prejudiced Petitioner.

As we stated previously, "[f]ailure to present the documents at the post-conviction hearing makes it nearly impossible for [a] [p]etitioner to show that trial counsel's deficient performance in failing to obtain or introduce the document at trial prejudiced the defense." *Daetrus Pilate*, 2018 WL 3868484, at *5. Moreover, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. Because Petitioner did not introduce his notes at the post-conviction hearing or testify as to their contents and because the post-conviction court accredited trial counsel's testimony

regarding his seating arrangement, Petitioner has failed to establish deficient performance or prejudice, and he is not entitled to relief on this issue.

## **Conclusion**

For the foregoing reasons, the judgment of the post-conviction court is affirmed.


_____
ROBERT L. HOLLOWAY, JR., JUDGE